*E-FILED - 11/30/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR ARTHURO OROPEZA, | No. C 09-1871 RMW (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING CERTIFICATE OF APPEALABILITY |
| v. | |
| WARDEN ROBERT K. WONG, | |
| Respondent. | |

Petitioner, a state prisoner proceeding pro se, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a 2006 decision by the California Board of Parole Hearings ("Board") finding him unsuitable for parole. Respondent was ordered to show cause why the writ should not be granted. Respondent has filed an answer, along with a supporting memorandum of points and authorities and exhibits. Petitioner has responded with a traverse. For the reasons set forth below, the petition for a writ of habeas corpus is **DENIED**.[1]

---

[1] Petitioner filed a request for the court to take judicial notice of his February 22, 2010 subsequent parole hearing in which the Board denied parole. (Docket No. 23.) Respondent filed an opposition. Petitioner then filed a motion for the court to take judicial notice of a superior court decision (docket no. 26) in which the superior court granted his petition for habeas relief based on a challenge to his February 22, 2010, denial of parole. Petitioner's motions for judicial notice are GRANTED. See Fed. R. Evid. 201(b); Taylor v. Charter Med. Corp., 162 F.3d 827, 828 (5th Cir. 1998) (holding that records of another court, but not its factual findings, are judicially noticeable). The court notes that the doctrines of collateral estoppel and res judicata

# BACKGROUND[2]

On March 1, 1991, Richard Figueroa ("victim") and his brother, Dennis, were at a restaurant and nightclub in San Jose. (Op. at 2.) At around 2:00 a.m., they left the establishment with their friends, Gus Toumi, Brenda Butler, and Susan Douglass, and headed to Butler's condo. (Id. at 2-3.) Butler drove Toumi and Dennis in her car, and Douglass followed them in her car, with the victim as the passenger. (Id. at 3.) As they were getting on the Expressway, two men in a Honda Civic pulled alongside Butler's car. (Id.) The passenger in the Honda, petitioner, was yelling at Butler and "flipping [them] off." (Id.)

Butler pulled over because she wanted to wait for Douglass' car and also because she did not want the Honda to follow her. (Id.) A minute or two later, the Honda pulled up behind Butler, and behind the Honda was Douglass. (Id.) The Honda then moved slowly up to the side of Butler's car. (Id.) Butler told Toumi she did not want the Honda to follow her to her apartment and asked Toumi to get out and tell Douglass that they were not leaving until the Honda left. (Id.) As Toumi was going to Douglass' car, petitioner formed a "gun" with his hand and pointed it at Butler. (Id.) Butler became afraid and drove off. (Id.) Toumi testified that as she drove off, he heard her scream that petitioner had a knife. (Id. at 4.)

The Honda followed Butler. (Id.) Butler turned off her lights and pulled into someone's driveway. (Id.) About 20 seconds later, she saw the Honda pull into a driveway across the street. (Id.) Thinking she had been followed, she drove away, sped up to lose the Honda, and drove to her apartment complex. (Id.) When she did not see the Honda any longer, she pulled into her garage, and she and Dennis went up to her apartment. (Id.)

Meanwhile, Toumi got into Douglass' car and saw Butler drive out of the driveway and speed away. (Id.) Although Douglass tried to follow Butler, she was too fast and Douglass

---

do not apply because the superior court decision addressed the constitutionality of the 2010 Board decision, not the 2006 decision challenged in this case. See generally Montana v. United States, 440 U.S. 147, 153 (1979). In light of the court's disposition of this matter, petitioner's motion for appointment of counsel is DENIED.

[2] The relevant facts are taken from California Court of Appeal's opinion. (Petition, Ex. B, In re Oropeza, H032427, Jan. 27, 2009 ("Op."))

1  accidentally turned onto a dead end street. (Id.)  She made a u-turn and on the way back, she

2  heard two loud thumps hitting the back of her car. (Id.)  Douglass pulled over and got out to see

3  what it was. (Id.)

4       After Douglass got out of the car, the Honda pulled up next to her and she saw petitioner

5  holding a knife with a four-inch long blade. (Id.)  Douglass jumped into her car and sped off and

6  the Honda followed her. (Id.)  Douglass pulled into a parking lot near Butler's apartment and

7  thought she had lost the Honda because she did not see it behind her. (Id.)  Twenty seconds

8  later, the Honda pulled up behind Douglass and blocked her in by parking perpendicularly to

9  Douglass' car. (Id. at 5.)

10       Petitioner and his co-defendant ran to Douglass' car. (Id.)  The victim got out and held

11  his hands with the palms up as if to ask what the problem was. (Id.)  Petitioner and his

12  co-defendant did not say anything, but attacked the unarmed victim. (Id.)  They each hit him

13  about a dozen times, moving their arms quickly. (Id.)  After about thirty seconds, petitioner and

14  his co-defendant ran back into the car and drove off. (Id.)

15       Afterward, the victim walked toward Douglass' car and looked at her. (Id.)  Before he

16  could reach her, however, he fell to the ground. (Id.)  He died at the hospital a few hours later.

17  (Id.)  The autopsy revealed that the victim suffered 23 knife wounds. (Id.)

18       Petitioner was found guilty at a jury trial of second-degree murder. (Id. at 6.)  The trial

19  court sentenced him to 15-years to life. (Id.)

**DISCUSSION**

A. <u>Standard of Review</u>

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law

and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams (Terry), 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, that is, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. See id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000). In this case, the last reasoned opinion is that of the California Court of Appeal denying petitioner's habeas petition (Petition, Ex. B).

B. December 1, 2006 Board Hearing

Petitioner had been incarcerated for approximately 14 years at the time of his 2006 hearing. Petitioner's minimum parole eligibility date was June 7, 2001. (Petition, Ex. A, 2006

Transcript ("Tr.") at 1.)

   1.   <u>Petitioner's version of events</u>

That night, petitioner had been drinking beer, and after initially opting not to go bowling with some friends, he changed his mind because he had been working all week and it was his first week working day shifts instead of nights. (<u>Id.</u> at 26-27.) At some point in the night, petitioner also had a few mixed drinks with vodka. (<u>Id.</u> at 27.) Petitioner stated that he had always been a responsible person and drinking excessively was not a common occurrence for him. (<u>Id.</u> at 28-29.)

Petitioner found the knife that he used in his co-defendant's car. (<u>Id.</u> at 30.) Petitioner stated that when the parties began to argue, everyone overreacted. (<u>Id.</u> at 32.) Petitioner was not aware that the victim was unarmed. (<u>Id.</u>) Petitioner recalls that when his co-defendant first stopped in car in a driveway, it was the driveway of a friend's house, and they hid behind a fence. (<u>Id.</u> at 33.) Petitioner then saw Douglass' car stop across the street and one of the guys in the car started to taunt him, so petitioner picked up a stone and threw it at the car. (<u>Id.</u>) Words were exchanged and Douglass drove away. (<u>Id.</u>) As petitioner and his co-defendant got back into their car and started to make a u-turn, Douglass drove back. (<u>Id.</u>) She got out of the car and started yelling at and threatening petitioner. (<u>Id.</u> at 33-34.) At that point, petitioner started to get angry. (<u>Id.</u> at 34.) Petitioner states that Douglass said she was going to come back to get him with a .45 and, at that point, petitioner picked up the knife. (<u>Id.</u>)

Douglass then drove off, and petitioner's co-defendant followed them. (<u>Id.</u>) When Douglass pulled over, petitioner's car also pulled over. (<u>Id.</u>) Petitioner and the victim got out of their cars and began arguing. (<u>Id.</u>) Soon, it turned into a fistfight and then, the stabbing. (<u>Id.</u>) As soon as petitioner realized what he was doing, he stopped. (<u>Id.</u>) When the physical altercation began, petitioner started stabbing the victim in the leg. (<u>Id.</u> at 35.) When petitioner realized that he was swinging widely, he was angry with himself right away and felt shame. (<u>Id.</u>) He and the victim looked at each other and petitioner knew he had stabbed him. (<u>Id.</u>) The co-defendant was calling petitioner back to the car, so petitioner said, "I'm sorry" to the victim and ran. (<u>Id.</u> at 36.) Petitioner did not get help for the victim because he knew that there were

1 other people around who would have done so, and because the victim was still standing when he left. (Id.) When petitioner later learned how many times he had stabbed the victim, he was in disbelief. (Id.)

When asked what he thinks about when he thinks about the victim, petitioner responded that he killed him and prays to God for forgiveness. (Id. at 46.) Petitioner felt sorry that the victim was not able to say goodbye to his family, and thought about the pain that the victim suffered. (Id.) Petitioner realized that he was drunk when he killed the victim, and understands that the events leading up to the killing were "silly." (Id. at 46-47.)

2.  Pre-incarceration factors

Petitioner has no criminal juvenile record. (Id. at 37.) His adult criminal record revealed only two convictions for driving with a suspended license. (Id.)

Petitioner was 26 years old at the time of the commitment offense. (Id. at 38.) His parents divorced shortly after he was born, and petitioner was raised by a stepfather. (Id. at 39.) Petitioner has seven siblings, and remains in close contact with all of them. (Id. at 40.)

Petitioner remains married and has three children, the youngest of whom was two years old at the time he became incarcerated. (Id. at 42.) Through his therapist, petitioner has explained to his children how he came to be incarcerated. (Id. at 43-44.)

3.  Post-incarceration factors

While incarcerated, petitioner has received only one CDC 115, which was in 1995, for trafficking contraband. (Id. at 48.) Petitioner explained that he had taken cartoon drawings for Easter for his children during a visit and did not clear it first with the officer. (Id. at 51.) Petitioner also received four CDC 128s, the most recent in 2001 for disobeying an order.[3] (Id.)

Since July 2004, petitioner received laudatory chronos from Alcoholics Anonymous ("AA"); "Kairos;" the Marine Mammal Center; the Restorative Justice Seminar; Responsibility Rehabilitation and Restoration Ecumerical Round Table; the San Quentin Thousand Mile

---

[3] Petitioner explained to the Board that the recent disciplinary chrono had been recanted (id. at 51-52, 53-55), however, because there was no documentation in petitioner's C-file reflecting any recantation, the Board did not take the recantation into consideration. (Id. at 170.)

1 Runathon; and Trust.  (Id. at 56.)  Petitioner received chronos commending his attendance at the
2 San Quentin College and for his work ethics.  (Id.)

3 Petitioner stated that he received his AA degree, which was through a free program.  (Id.
4 at 57, 59.)  Petitioner wanted to achieve his Bachelor's degree, had already found a sponsor to
5 pay for the tuition, but was currently on a wait list to get the books and other materials.  (Id. at
6 58-59.)  Petitioner has completed four vocational training courses and received certificates from
7 the Machinist Shop, Mechanical Drafting, CAD Drafting, and Sheet Metal.  (Id. at 61-65, 98-
8 99.)

### 4. Psychological evaluation

The report predicted that, should petitioner remain alcohol-free, his prognosis for success was excellent.  (Id. at 71.)  Petitioner was observed to have no history of serious mental illness but had a history of alcohol abuse.  (Id.)  The evaluator found that petitioner expressed remorse for his crime and insight into the behavior that led up to the crime.  (Id.)  Petitioner had no history of violent behavior and, while incarcerated, demonstrated no violent offenses.  (Id.)  The evaluator noted concern from petitioner's 2004 evaluation, in which petitioner stated that he did not think he had a drinking problem and drank only occasionally.  (Id. at 72.)  When the evaluator discussed this comment with petitioner, he admitted that he realized since then that he was a "functional alcoholic" and acknowledged that drinking not only caused problems in his marriage, but also was a causative factor in the crime.  (Id.)

The report concluded that there was "little likelihood that [petitioner] would become [involved] in any criminal activity in the future.  He has a better understanding of the negative role of alcohol in his life, and demonstrates a willingness to address this problem."  (Id. at 78.)  However, the report then stated that petitioner's potential for violence was low in a controlled setting, and the biggest concern would be if petitioner assumed that he was not at risk for alcohol relapse because he has remained sober while incarcerated.  (Id.)

### 5. Parole plans

If released from prison, petitioner planned to live with his wife and children in San Jose.  (Id. at 86.)  The Board noted that petitioner received many support letters and non-specific offers

1 of employment or offers of assistance to help petitioner find employment. (Id. at 87-96.)

      6.    <u>Board's decision</u>

The Board denied parole, finding that the crime was carried out in a very dispassionate manner, demonstrating an exceptionally callous disregard for human suffering. (Id. at 169.) The Board also found that the motive was very trivial in relation to the offense. (Id.) The Board further found that petitioner's behavior at the hearing was inconsistent with the conclusions stated in the psychological report. (Id. at 169-170.) Specifically, the Board observed that petitioner "consistently externalized important causative factors of the commitment offense, and he resisted focusing on details that might expose his motivation for the crime," thus, "continually focus[ing] attention away from and outside of himself." (Id. at 171.) Finally, the Board felt that petitioner did not have acceptable employment plans or documentation to support that. (Id.) As a result, the Board recommended that petitioner make further progress to discuss and understand the true causative factors of the crime. (Id.) The Board did commend petitioner for all the good programming he completed while incarcerated and noted that he had been doing extremely well, and was a very good inmate. (Id. at 172.) However, the Board urged petitioner to focus on the causative factors that resulted in his commitment offense. (Id.)

C.    <u>State Court Decisions</u>

Petitioner filed a state habeas petition in superior court. The superior court granted the petition. (Resp. Ex. 9.) The California Court of Appeal reversed. (Petition, Ex. B.) It concluded that there was some evidence supporting the Board's finding that petitioner would pose an unreasonable danger to society if released because (1) the crime was especially heinous because the motivation was very trivial and (2) petitioner appeared to place some of the responsibility for the stabbing on the victim and the victim's friends. (Id. at 17-18.) The California Supreme Court denied petitioner's subsequent state habeas petition.

D.    <u>Analysis</u>

The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the absence of some evidence of his or her "current dangerousness." <u>Hayward v. Marshall</u>, 603 F.3d 546, 555, 561 (9th Cir. 2010) (en banc). Under California law, however, "some evidence" of

current dangerousness is required in order to deny parole. Id. at 562 (citing In re Lawrence, 44 Cal. 4th 1181, 1205-06 (2008) and In re Shaputis, 44 Cal. 4th 1241 (2008)). This requirement gives California prisoners a liberty interest, protected by the federal constitutional guarantee of due process, in release on parole in the absence of "some evidence" of current dangerousness. Cooke v. Solis, 606 F.3d 1206, 1213-1214 (9th Cir. 2010).

When a federal habeas court in this circuit is faced with a claim by a California prisoner that his right to due process was violated because the denial of parole was not supported by "some evidence," the court analyzes whether the state court decision reflects "an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); see Cooke, 606 F.3d at 1213. California's "some evidence" requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hawyard, 603 F.3d at 562 (quoting Lawrence, 44 Cal. 4th. at 1191, 1210-14); see Cooke, 606 F.3d at 1213-1214 (describing California's "some evidence" requirement).

The commitment offense was certainly committed in an especially cruel and callous manner in that the motive for the crime was very trivial in relation to the offense. See Cal. Code Regs., tit. 15, § 2402(c)(1)(E). After becoming extremely intoxicated, petitioner and his co-defendant escalated what appeared to begin as a case of road rage to a full-fledged attack on an unarmed man, even after petitioner admitted that he saw no weapons on anyone in the victim's car, and inflicted 23 stab wounds in less than a minute.

Significantly, the murder was not the only reason for the unsuitability finding. Even aside from the fact that the commitment offense was especially cruel and was committed for a

very trivial motive, there was other evidence that reasonably demonstrated petitioner was still a current threat to society if released. Specifically, petitioner's behavior and responses during the parole hearing can be inferred as supporting a reasonable finding that he lacked insight into the causative factors of the crime.

A prisoner's remorse or demonstrated understanding of the nature and magnitude of the commitment offense is one factor tending to indicate the prisoner is suitable for release. 15 Cal. Code Regs., tit. 15, § 2402(d)(3). "Lack of insight," however, is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness. In re Calderon, 184 Cal. App. 4th 670, 690 (2010) (recognizing that "lack of insight" is not a cited factor for unsuitability in the California Code of Regulations).

The record demonstrates that petitioner characterized the events leading up to the murder as a "cat and mouse game," and repeatedly expressing his belief those events were "silly." Further, although petitioner stated that he took full responsibility for the crime, the record supports the Board's observation that he appeared to minimize his involvement into the cause of the crime by making mention that the victim and his friends were also drunk; that the victim's brother testified at trial that he believed he and his friends overreacted; and that he believed that as he was stabbing the victim, even though petitioner recognized that he was swinging widely, he thought he was only stabbing the victim in the leg and foot. It was reasonable for the Board to infer from these statements that, by externalizing the causes of the crime and minimizing his own fault, petitioner still posed an unreasonable risk of danger to society if released. See Shaputis, 44 Cal. 4th at 1260 (upholding a denial of parole based, in part, on Shaputis' failure to grasp the nature of his commitment offense).

Thus, some evidence supports the Board's denial of parole suitability. Although the record demonstrates many positive aspects of petitioner's life before and during his fourteen years of incarceration, the court cannot reweigh the evidence as long as the record shows "due consideration of the specified factors as applied to the individual prisoner." See Shaputis, 44 Cal. 4th at 1260-61. These factors indicated "that the implications regarding the prisoner's

dangerousness that derive from his [ ] commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." See Lawrence, 44 Cal.4th at 1214. The state court's rejection of petitioner's petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Petitioner therefore is not entitled to federal habeas relief.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED. Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Reasonable jurists could find the court's assessment of the claim debatable. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Thus, a certificate of appealability is GRANTED.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 11/30/10

RONALD M. WHYTE
United States District Judge